UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAJOR L. RUSSELL,

      Plaintiff,                         Case No. 16-cv-11857
                                                Hon. Matthew F. Leitman

v.

CITY OF DETROIT, *et al*.,

      Defendants.

_____/

## <u>OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF #28)</u>

Plaintiff Major L. Russell, a former employee of the City of Detroit Fire Department (the "DFD"), brings this civil action against several of his former superior officers at the DFD and against the City of Detroit. Russell asserts a claim under 42 U.S.C. § 1981 ("Section 1981") for race discrimination and a claim under 42 U.S.C. § 1983 ("Section 1983") for retaliation in violation of the First Amendment. The Defendants have moved for summary judgment on both claims. (*See* ECF #28.) Russell now concedes that he may not assert his race discrimination claim against the Defendants under Section 1981. And as explained below, all of the Defendants other than Deputy Chief Houseworth are entitled to summary judgment on his First Amendment retaliation claim. Accordingly, the Court **GRANTS** the Defendants' motion for summary judgment on Russell's race

discrimination claim, **GRANTS** summary judgment in favor of all Defendants other than Houseworth on Russell's First Amendment retaliation claim, and **DENIES** summary judgment against Houseworth on Russell's First Amendment retaliation claim.

## I

## A

On May 5, 1986, Russell, an African American, began working as a Firefighter Driver with the DFD. (*See* Russell Dep. at 9, ECF #30-2 at Pg. ID 830.) In 1998, the DFD promoted Russell to Fire Engine Operator. (*See id.* at 10, Pg. ID 830.)  Russell held that position until he retired on April 14, 2017. (*See id.* at 181, ECF #30-3 at Pg. ID 893.)

The DFD is organized with the following rank structure and job titles:

- Executive Fire Commissioner
- First Deputy Commissioner
- Second Deputy Commissioner
- Chief of Department
- Deputy Chief
- Senior Chief
- Battalion Chief
- Captain
- Senior Lieutenant
- Lieutenant
- Fire Engine Operator
- Firefighter Driver
- Senior Firefighter
- Firefighter
- Trial Firefighter

During the time periods at issue in this case, Defendant Craig Dougherty was Chief of Department, Defendant James Houseworth was Deputy Chief, and Defendants Joseph Rinehart, Eugene Biondo, and Joseph English were Battalion Chiefs.

**B**

In December 2012, Russell was assigned to Engine 17 of the DFD. (*See id.* at 13, ECF #30-2 at Pg. ID 831.) At that time, Sean Flanagan, a Caucasian firefighter who was also assigned to Engine 17, started treating Russell inappropriately. First, Flanagan physically and verbally intimidated Russell during a fire engine run on December 9, 2012. (*See id.* at 122, Pg. ID 858.) Before that run began, Russell and Flanagan consulted a wall map for directions to the fire emergency's location. (*See id.*) Russell and Flanagan then approached the fire engine, and Russell heard Flanagan say something. (*See id.*) Believing that Flanagan was talking about the directions, Russell asked Flanagan to repeat what he said. (*See id.*) In response, Flanagan "blew up and went into a tirade." (*See id.*) He repeatedly told Russell to "shut the fuck up." (*See id.*) Flanagan then sat behind Russell in the fire engine and continued yelling as Russell drove. (*See id.* at 129, ECF #30-3 at Pg. ID 880.) Flanagan later attempted to climb over the interior barrier of the engine's cab and place his hands around Russell's neck. (*See id.*) Lieutenant Mark Knowles, also present on the run, then intervened and told Flanagan to sit down, and Flanagan did.

(*See id.*)  Following that incident, Russell considered filing a complaint against Flanagan, but Lt. Knowles convinced him not to. (*See id.* at 187, Pg. ID 894.)  For the next five months, Russell and Flanagan did not go on runs together.

Second, on May 15, 2013, Russell and Flanagan went on an emergency fire run, and Flanagan again verbally attacked and physically threatened Russell. (*See id.* at 139, Pg. ID 882.)  On that run, Engine 17 was responding to an incident in which a woman's car had caught fire on the freeway. (*See id.*)  On the drive back to the station, Russell again was driving, and Flanagan was in the back seat.  (*See id.* at 142, Pg. ID 883.)  Flanagan stated that he thought the fire was suspicious, and Russell perceived that Flanagan's suspicion was based on the fact that the woman driving the car was African American. (*See id.* at 143-44, Pg. ID 883-84.)  During their conversation, Flanagan told Russell to "shut the fuck up and drive." (*Id.*)  Russell and Flanagan argued until they arrived back at the engine house. (*See id.* at 146, Pg. ID 884.)  At the engine house, Flanagan approached Russell and physically intimidated Russell by standing within a foot of his face. (*See id.* at 146-48, Pg. ID 884.)

## C

Shortly after the second incident of harassment by Flanagan, Russell decided to initiate disciplinary charges against Flanagan.  On May 18, 2013, Russell completed a form entitled "Official – Detroit Fire Department – Charge." (*See*

Flanagan Charge, ECF #31-3 at Pg. ID 1032-33.)  In a section of the form labeled "CHARGE," Russell identified numerous policies that he believed Flanagan had violated: "G/R 5.41 Neglect of Duty, G/R 11.2 Intimidation of a Member of Lesser Rank, G/R 5.1 Using Profane and Abusive Language, Violation of Executive Order No. 2010-1 Violence in the Workplace, Violation of Executive Order No. 2010-2 Internal Policy Against Discrimination and Harassment." (*Id.*)  The last policy identified by Russell, Executive Order No. 2010-2, prohibits "discrimination on the basis of race, color, religious beliefs, national origin, age, marital status, disability, sex, sexual orientation, or gender identification or expression" in the workplace. (Executive Order, ECF #31-4 at Pg. ID 1041.)  Finally, in a section of the form labeled "SPECIFICATION," Russell wrote: "Sergeant Sean Flanagan used physical and verbal intimidation towards FEO Major Russell.  Sergeant Sean Flanagan used profane and abusive language towards FEO Major Russell.  A letter of further explanation is attached." (*Id.*)

In the attached letter – which was addressed to Donald Austin, Executive Fire Commissioner (the "Austin Letter") – Russell cited the same anti-harassment and anti-discrimination policies that he identified on the charge form, including Executive Order No. 2010-2. (*See id.* at Pg. ID 1036-1039.)  The Austin Letter also described in greater detail the harassing conduct by Flanagan that, according to Russell, violated the City of Detroit's anti-discrimination policies.

After Russell prepared the charge form and Austin Letter, he attempted to submit them to the DFD in accordance with the Department's disciplinary policies and procedures. Under those rules, a grievant first submits charges to a Battalion Chief. (*See* DFD Admin. Manual, ECF #31-8 at Pg. ID 1103.) The Battalion Chief is then required to review the charges and forward them to the appropriate Deputy Chief at the DFD's headquarters in downtown Detroit. (*See id.*) At that point, the DFD investigates the charges by, among other things, speaking with witnesses and taking statements. (*See* Houseworth Dep. at 16-17, ECF #30-5 at Pg. ID 946.) Finally, the DFD holds a hearing and decides whether to discipline the subject of the charges or dismiss the charges. (*See id.* at 17, 20, Pg. ID 946-47.)

Russell contends that the individual Defendants did not handle his charges properly. Specifically, he says that the individual Defendants ignored his charges and/or refused to send the charges to the next level of the disciplinary process for additional review and investigation. (*See, e.g.*, Russell Dep. at 34-37, 54-55, 58-59, 64-65, 80-82, ECF #30-2 at Pg. ID 836-37, 841-42, 844, 848-49.) And he asserts that the individual Defendants – some of whom are African American – denied him access to the DFD's internal disciplinary process because he is African American.[1] (*See, e.g.,* Compl. at ¶ 19(f), (k), (l).) He contends that as a result of the individual

---

[1] Deputy Chief Houseworth, Battalion Chief Buchanan, and Chief of Department King are African American. (*See* Russell Dep. at 120-21, ECF #30-2 at Pg. ID 858.)

Defendants' acts and omissions, the DFD never investigated his charges against Flanagan, never held a hearing on the charges, and never issued a decision with respect to the charges.

Russell also says that the Defendants retaliated against him for filing the charges against Flanagan. For instance, he contends that Deputy Chief Houseworth threatened that Russell would experience a "mind fuck" in retaliation for pursuing his charges. (Russell Dep. at 42-43, ECF #30-2 at Pg. ID 838.) He likewise insists that as a result of the charge, Chief of Department Dougherty refused to permit him to reschedule a furlough to begin on June 19, 2013 (*see id.* at 104-06, Pg. ID 854), and Russell says he was falsely accused of being "AWOL" (absent without leave) from work. (*See id.* at 17-18, ECF #30-2 at Pg. ID 832.) Finally**,** Russell also maintains that he was denied the opportunity to work overtime. (*See id.* at 218-20, ECF #30-3 at Pg. ID 902-03.)

### D

At the same time Russell was pursuing disciplinary action against Flanagan, Flanagan was pursuing disciplinary action against Russell. (*See* ECF #31-11.) On May 30, 2013, Flanagan submitted written charges against Russell in which Flanagan accused Russell of "us[ing] coarse and profane language to Sgt. Sean Flanagan and Sgt Michael Dillon this being a violation of G.R. 5.1 [addressing

conduct with immediate supervisors]." (*Id.* at Pg. ID 1120; *see* ECF #31-9 at Pg. ID 1109-10.)

Flanagan's charges, like Russell's, went nowhere. Indeed, Flanagan did not "hear anything at all" after he filed his charges against Russell (Flanagan Dep. at 21, ECF #28-2 at Pg. ID 399), nor did Flanagan ever receive any "resolution" of his charges against Russell. (*Id.* at 14-15, Pg. ID 397.)

**E**

The DFD has a standard practice that it "always" follows when, as here, two employees have a workplace conflict that presents a risk of workplace violence.[2] (Lyon Dep. at 43, ECF #28-2 at Pg. ID 498; *see also* Dougherty Dep. at 21, ECF #28-2 at Pg. ID 597; Houseworth Dep. at 61-62, ECF #28-2 at Pg. ID 543.) That practice is to temporarily "detail" each of the employees to separate stations in different areas until their conflict is investigated and resolved. (Lyon Dep. at 43, ECF #28-2 at Pg. ID 498; Dougherty Dep. at 21, ECF #28-2 at Pg. ID 597; Houseworth Dep. at 61-62, ECF #28-2 at Pg. ID 543; Flanagan Dep. at 12, ECF #28-2 at Pg. ID 397; Biondo Dep. at 60, ECF #28-2 at Pg. ID 432.)

Consistent with this standard practice, around June 12, 2013, Houseworth issued an order detailing Russell and Flanagan to stations other than Engine 17 on

---

[2] As noted above, in Russell's charge form against Flanagan and the attached Austin Letter, Russell charged Flanagan with violating the DFD's policy banning violence in the workplace. (*See* Flanagan Charges, ECF #31-3 at Pg. ID 1032, 1036.)

the days that they were scheduled to work together. (*See* Russell Dep. at 98, ECF #30-2 at Pg. ID 852; ECF #31-9 at Pg. ID 1110-11.) In a later email, dated June 28, 2013, Dougherty confirmed that Flanagan and Russell were to be detailed to stations other than Engine 17 on days they were scheduled to work together. (*See* ECF #28-2 at Pg. ID 611.)

The DFD detailed Russell to engine houses on the east side of Detroit. (*See* Russell Dep. at 94-95, ECF #30-2 at Pg. ID 851.) Russell's temporary detail lasted only "a couple of weeks," and after that time he returned to Engine 17. (*See id.* at 95, Pg. ID 851.) During that two-week period, Russell worked on roughly four days.[3] On those four days, Russell's commute to work was roughly fifteen minutes longer than his commute to Engine 17. (*See id.* at 235, ECF #30-3 at Pg. ID 906-07.) In addition, unlike Engine 17, the stations to which Russell traveled on the four work days were not located near the fitness facility at which Russell regularly worked out. (*See id.* at 235-36, Pg. ID 906-907.)

The DFD sent Flanagan to Engine 40 on the west side of Detroit. (*See* Flanagan Dep. at 13, ECF #28-2 at Pg. ID 397.) After Flanagan began this detail, he left work on a medical leave. (*See id.* at 12, Pg. ID 397.) Flanagan transferred to

---

[3] DFD firefighters work on a "Kelly" schedule, in which, on average, they work two entire days (48 hours) during any given week. (*See* Russell Dep at 99-100, ECF #30-2 at Pg. ID 852-53.)

another engine house when he returned from his medical leave. (*See id.*)  Flanagan did not return to Engine 17. (*See* Russell Dep. at 232-33, ECF #30-3 at Pg. ID 906.)

**F**

While the DFD did not conduct an investigation into Russell's charges against Flanagan, the City of Detroit Human Rights Department did. (*See* Human Rights Ltr. to Exec. Commissioner, ECF #32-10.)  That department assigned Lesa Kent to inquire into Russell's allegations.  At the end of her inquiry, Kent concluded that the Russell's allegations of workplace violence against Flanagan were "not substantiated." (*Id.* at Pg. ID 1181; emphasis omitted.)  Kent, however, did opine that Flanagan's behavior was "not only offensive and unprofessional but was unnecessary in the situation." (*Id.*)  Kent recommended that Flanagan be "reissued a copy of Executive Order No. 2010-1, counseled on violence in the workplace in accordance with City of Detroit guidelines, and disciplined based on department guidelines for conduct unbecoming a supervisor." (*Id.*)

**G**

On August 15, 2013, Russell filed charges with the Equal Employment Opportunity Commission (the "EEOC") against the City of Detroit. (*See* EEOC Charge, ECF #32-12.)  In these charges, Russell maintained that he was subjected to racial discrimination by Flanagan and by his superiors who impeded his effort to seek discipline against Flanagan. (*See id.* at Pg. ID 1186.)

On May 22, 2014, the EEOC informed Russell that after a review of his case file, it was dismissing his charges of discrimination and retaliation. (*See* EEOC Ltr., ECF #28-2 at Pg. ID 659.)  The EEOC concluded that Russell was not subjected to discrimination or an adverse employment action:

> Today (May 22, 2014), during our telephone conversation, you [Russell] were informed that the evidence reveals that Sergeant Flanagan (Caucasian) threatened you with bodily harm and that he used profanity towards you.  The evidence does not reveal that you complained to the employer that you were subjected to these actioned by Sergeant Flanagan due to your race and/or gender.  After you complained, you were not treated unfavorably and you have not incurred an adverse employment action.  Based on the previously-mentioned information, it does not appear that you were discriminated or retaliated against based on the laws enforced by this Agency.

(*Id.*)

## H

On May 24, 2016, Russell filed this action against the City of Detroit, John King, Sean Flanagan, James Houseworth, Joseph English, Joseph Rinehart, Eugene Biondo, Cecilia Buchanan, and Craig Dougherty. (*See* Compl., ECF #1.)  On September 11, 2017, the Court entered an order in which it dismissed the Complaint against Defendants John King, Sean Flanagan, and Cecilia Buchanan for failure to prosecute. (*See* ECF #26.)  Thus, only the City of Detroit, James Houseworth, Joseph English, Joseph Rinehart, Eugene Biondo, and Craig Dougherty remain as Defendants.

Russell's Complaint contains two counts.  In Count I, Russell brings a claim under Section 1981 for intentional race discrimination.  He claims that the Defendants discriminated against him based upon his race by "depriv[ing] [Russell of] the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of his contractual employment relationship with Defendant [City of Detroit]." (Compl. at ¶25, ECF #1 at Pg. ID 8-9.)  In Count II, Russell brings a claim under Section 1983 for retaliation in violation of the First Amendment.  He alleges that his charges against Flanagan included protected speech under the First Amendment and that the Defendants retaliated against him (in the ways described above) for that protected speech. (*See id.* at ¶¶ 33-34, Pg. ID 10.)

On November 6, 2017, the Defendants moved for summary judgment. (*See* ECF #28.)  The Court held a hearing on the motion for summary judgment on March 15, 2018.

Following the motion hearing, the Court conducted independent research into Russell's claim under Section 1981.  The Court then entered an order directing Russell to show cause why that claim should not be dismissed with prejudice based upon the decisions of the United States Court of Appeals for the Sixth Circuit in *Arendale v. City of Memphis*, 519 F.3d 587, 598 (6th Cir. 2008) (holding that a plaintiff may not assert a claim under Section 1981 against a municipality),

*McCormick v. Miami Univ.*, 693 F.3d 654, 659 (6th Cir. 2012) (holding that a plaintiff may not assert a claim under Section 1981 against a state actor in his individual capacity), and *Ginter v. Knight*, 532 F.3d 567, 577 (6th Cir. 2008) (holding that a plaintiff may not assert a claim under Section 1981 against a state actor in his official capacity). On April 16, 2018, counsel for Russell filed a response in which he said: "In light of the authority cited by this Court in opposition to the viability of Plaintiff's claim under 42 U.S.C. §1981, and after exhaustive research verifying the same, Plaintiff disagrees with the reasoning of the authority but is unable to distinguish it and concedes that it is controlling." (ECF #38 at Pg. ID 1246.)

## II

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact . . . ." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252. Summary judgment is not appropriate when "the

evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-52. Indeed, "[c]redibility determinations, the weighing of the evidence and the drafting of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Id.* at 255.

## III

As Russell properly concedes, the Defendants are entitled to summary judgment on his claim under Section 1981. That statute "prohibits racial discrimination in the making and enforcement of contracts." *McCormick*, 693 F.3d at 659. Its protection "extends to 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006) (quoting 42 U.S.C. § 1981(b)). But the statute does not provide a cause of action against a municipality, *see Arendale*, 519 F.3d at 598, against a state actor in his individual capacity, *see McCormick*, 693 F.3d at 661, or against a state actor in his official capacity. *See Ginter*, 532 F.3d at 577. Thus, Russell's Section 1981 claims against the City of Detroit and the individual Defendants (all of whom Russell alleges to be state actors) fail as a matter of law. The Court therefore grants Defendants' motion for summary judgment on Russell's Section 1981 claims.

## IV

All of the Defendants other than Houseworth are entitled to summary judgment on Russell's Section 1983 claim for First Amendment retaliation.[4]

### A

"First Amendment retaliation claims are analyzed under a burden-shifting framework." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012). Under that framework, "[a] plaintiff must first make a prima facie case of retaliation, which comprises the following elements: (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Id.* (internal quotations omitted). "If the employee establishes a prima facie case, the burden then

---

[4] Section 1983 provides in relevant part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Id.* (internal quotations omitted). "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id.* (internal quotations omitted). "[T]the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims." *Id.*

## B

Defendants first argue that they are entitled to summary judgment on Russell's First Amendment retaliation claim because Russell did not engage in any constitutionally protected speech. The Court disagrees.

"Three Supreme Court cases define the contours of the free speech rights of public employees." *Evans-Marshall v. Bd of Educ. of Tipp Exempted Vill. Sch. Dist.*, 624 F.3d 332, 337 (6th Cir. 2010). These cases establish three "requirements":

> *The "matters of public concern" requirement*. The First Amendment protects the speech of employees only when it involves "matters of public concern." *Connick v. Myers*, 461 U.S. 138, 143 (1983). In *Connick* . . . the Court explained that not all employee speech is protected, only speech that "fairly [may be] considered as relating to" issues "of political, social, or other concern to the community." *Id.* at 146. . . . When, by contrast, an employee's speech does not relate to a matter of public concern, public officials enjoy "wide latitude" in responding to it without "intrusive oversight by the judiciary in the name of the First Amendment." *Id.*

*The "balancing" requirement.* If the employee establishes that her speech touches "matters of public concern," a balancing test determines whether the employee or the employer wins. *See Pickering [v. Board of Education]*, 391 U.S. [563,] 568 [(1968)]. . . . In resolving the claim, the Court "balance[d] . . . the interests of the teacher, as a citizen, in commenting on matters of public concern" against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." [*Id.*]

[….]

*The "pursuant to" requirement.* In the last case in the trilogy, a prosecutor reviewed a private complaint that a police officer's affidavit used to obtain a search warrant contained several misrepresentations. *Garcetti [v. Ceballos ]*, 547 U.S. [410,] 413-14 [(2006)]. . . . In rejecting [the public employee's] free-speech claim, the Court did not deny that the prosecutor's speech related to a matter of "public concern" under *Connick*, and it did not take on the lower court's reasoning that *Pickering* balancing favored the employee. It instead concluded that the First Amendment did not apply. "The controlling factor," the Court reasoned, "is that his expressions were made pursuant to his duties as a calendar deputy," making the relevant speaker the government entity, not the individual. *Id.* at 421 . . . . "We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*

*Id.* at 337-38.

Defendants insist that Russell cannot satisfy the "matter of public concern" requirement because his complaints about Flanagan "concerned an employment

matter only of personal interest . . . ."[5] (Mot. for Summ. J., ECF #28 at Pg. ID 222.)
This argument has real force. Russell's primary contention in the body of the Austin
Letter appears to be that Flanagan did not treat him (Russell) with the appropriate
level of respect due to a driver of his rank and seniority. (*See* Austin Letter, ECF
#31-3 at Pg. ID 1036.) Thus, the body of the letter looks a lot like a run-of-the-mill
employee "beef" that is not a matter of public concern. *See Farahat v. Jopke,* 370
F.3d 580, 593 (6th Cir. 2004).

But the body of the letter does not stand alone. It is preceded and framed by
Russell's reference to the anti-discrimination policy in Executive Order No. 2010-2.
(*See* Austin Letter, ECF #31-3 at Pg. ID 1036.) The body of the letter is therefore
reasonably understood to be describing mistreatment by Flanagan that Russell
regards as examples of unlawful discrimination. In fact, both Lesa Kent, of the
Human Rights Department, and Chief of Department Dougherty understood that
Russell's charge form and the attached Austin Letter raised concerns about
"discrimination" by Flanagan. (Dougherty Dep. at 13, 26, ECF #28-2 at Pg. ID 595,
598; Kent Dep. at 17, ECF #28-2 at Pg. ID 621.) Moreover, Russell told at least
some of his superior officers within the DFD that his charges against Flanagan were

---

[5] During the hearing on Defendants' motion for summary judgment, the Court
pressed Russell's counsel to specifically identify the protected speech on which
Russell's First Amendment claim is based. Counsel clarified that the claim is based
upon his racial discrimination allegations in the charge form against Flanagan and
the attached Austin Letter.

based, at least in part, on "discrimination" by Flanagan. (Russell Dep. at 221, ECF #30-3 at Pg. ID 903.)

Allegations of unlawful discrimination are "inherently a matter of public concern." *Perry v. McGinnis*, 209 F.3d 597, 608 (6th Cir. 2000). Indeed, it is "well-settled" that allegations of "racial harassment" are matters of public concern. *Bonnell v. Lorenzo*, 241 F.3d 800, 812 (6th Cir. 2001). And that is true "even if [the allegations] are tied to personal employment disputes." *Warren v. Ohio Dep't of Public Safety*, 24 Fed. App'x 259, 267-68 (6th Cir. 2001). Thus, Russell's complaint that Flanagan violated the City of Detroit's anti-discrimination policy involved a matter of public concern. *See Perry*, 209 F.3d at 608-10 (holding that allegation of racial discrimination was matter of public concern).

That Russell's charges included some matters of private interest does not remove the charges from the realm of public concern. "The relevant analysis here is whether the communication touches "upon matters *only* of personal interest . . . ." *Mosholder v. Barnhardt*, 679 F.3d 443, 450–51 (6th Cir. 2012) (quoting *Connick,* 461 U.S. at 147, 103 S.Ct. 1684 (emphasis added)). "A public concern/private interest analysis does not require that a communication be utterly bereft of private observations or even expressions of private interest." *Id.* On the contrary, the public concern requirement is met "if *any* part of an employee's speech . . . relates to a matter of public concern . . . ." *Bonnell*, 241 F.3d at 812 (emphasis

added).  That is the case here. *See Jennings v. Wayne County*, 2015 WL 5589869, at

**11-15 (E.D. Mich. Sept. 22, 2015) (holding that employee grievance motivated

"generally" by employee's "interest in her personal employment situation" satisfied

public concern requirement because it related to sexual harassment which, like racial

harassment, is a matter of public concern).  Accordingly, the Court rejects

Defendants' argument that Russell's First Amendment retaliation claim fails

because Russell did not speak on a matter of public concern.[6]

## C

Defendants further contend that Russell's claim fails because they did not

subject him to an adverse action and/or because if they subjected him to such an

action, they did not do so based upon his protected activity.  The Court agrees in

part.  As set forth below, Russell has identified one adverse action – an alleged threat

by Defendant Houseworth – that may have been based upon his protected speech

and that would not have been taken in the absence of his protected speech.  Thus,

the Court will grant summary judgment against Russell on his First Amendment

retaliation claim except to the extent that it rests upon the single alleged threat by

---

[6] In Defendants' motion for summary judgment, they do not attempt to show how Russell's claim fails under the *Pickering* balancing test nor do they contend that Russell was speaking pursuant to his job duties.  Thus, the Court will not grant summary judgment to the Defendants on the ground that Russell has failed to satisfy the "balancing requirement" or the "'pursuant to' requirement" as identified in *Evans-Marshall, supra.*

Deputy Chief Houseworth. The Court addresses below each adverse action identified by Russell.

**1**

Russell first contends that the Defendants took adverse action against him when they detailed him out of Engine 17 after he filed his charges against Flanagan. The Court has serious doubts as to whether the detailing rises to the level of an adverse action. For an action to qualify as "adverse," it must be serious enough to "deter a person or ordinary firmness from exercise of the right at stake." *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999). Common examples of adverse actions include "discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." *Id.* While "the effect on freedom of speech need not be great in order to be actionable," a court must nonetheless "be careful to ensure that real injury is involved." *Mezibov v. Allen*, 411 F.3d 712, 721 (6th Cir. 2005). In other words, the injury arising from an adverse action must be more than "*de minimis*." *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 584 (6th Cir. 2012). However, the adverse action "threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Thaddeus-X*, 175 F.3d at 398.

Russell's detail out of Engine 17 seems inconsequential in several respects. To begin, it lasted a very short time – roughly two weeks. (*See* Russell Dep. at 95,

ECF #30-2 at Pg. ID 851.)  And during that time, Russell would have been scheduled to work only four days. (*See id.* at 99-100, Pg. ID 852-53.)  Moreover, Russell's drive to the engine houses other than Engine 17 was a mere 15 minutes longer than his drive to Engine 17. (*See id.* at 235-36, ECF #30-3 at Pg. ID 906-07.)

Russell's primary complaint about the detailing appears to be that the engine houses other than Engine 17 were less convenient because they were not located as close to his workout facility. (*See id.*)  But interference with the convenience of Russell's preferred exercise routine does not seem to rise to the level of an adverse action.  *See, e.g.*, *Mills v. Willams*, 476 F. Supp. 2d 653, 661 (E.D. Mich. 2007), *aff'd. Mill v. Williams*, 276 Fed. App'x 417 (6th Cir. 2008) ("Purely personal reasons for preferring a former state of affairs over the current state of affairs are insufficient to make a change an adverse action." (citing *Strouss v. Michigan Dept. of Corrections*, 250 F.3d 336, 343 n.2 (6th Cir. 2001)); *Bradley v. Arwood*, 2014 WL 5350833, at *11 (E.D. Mich. Oct. 20, 2014) (same).

But even if the detailing did amount to an adverse action, Russell's First Amendment retaliation claim based upon the detailing would still fail.  That is because the Defendants have shown that Russell would have been detailed to another station even if his complaint against Flanagan did not include his protected speech concerning racial discrimination. *See Garceau v. City of Flint*, 2016 WL 4537813, at **19-20 (E.D. Mich. Aug. 31, 2016) (granting summary judgment on First

Amendment retaliation claim to defendants because "[d]efendants have shown that the employment decision would have been the same absent the protected conduct . . .").  As described above, the DFD detailed Russell out of Engine 17 because he and Flanagan were involved in a conflict that presented a risk of workplace violence.  The DFD always separated employees in this manner when a risk of workplace violence arose.[7]  Thus, the fact that Russell's charges included protected allegations of racial discrimination had nothing to do with the decision to detail him out of Engine 17.  Indeed, the DFD detailed Flanagan out of Engine 17 even though his charges against Russell did not contain any protected speech.  In short, on the record before the Court, no reasonable jury could find that the Defendants detailed Russell out of Engine 17 based upon his protected speech, and the Defendants are thus

---

[7] Russell did not present evidence contradicting the Defendants' testimony that it was the DFD's regular practice to separate employees involved in a workplace conflict that presented a risk of violence.  In Russell's deposition, he was asked generally about whether he was aware of a DFD policy to separate employees involved in a conflict.  He said that he was "not aware" of whether the separation happens in every case of a conflict and did not affirmatively deny that it happens. (Russell Dep. at 236, ECF #30-3 at Pg. ID 907.)  More importantly, the question focused on employee conflicts generally and was not limited to conflicts presenting a risk of workplace violence.  Russell offered no testimony – and has not submitted an affidavit – specifically addressing how the DFD responded to employee conflicts, like the one between himself and Flanagan, that presented a serious risk of workplace violence.  Thus, there is no evidence in the record contradicting the Defendants' testimony that the DFD always separated employees involved a conflict that presented a risk of violence.

entitled to summary judgment on Russell's retaliation claim to the extent that it rests upon the detailing.

**2**

Russell next contends that the Defendants took adverse action against him when they refused to permit him to reschedule his furlough. (*See* Russell Dep. at 104, ECF #30-2 at Pg. ID 854). Again, the Court has questions as to whether this conduct by Defendants rose to the level of an adverse action. It is not clear that refusing to allow an employee to reschedule previously-scheduled time off is sufficiently serious that it would chill a person of ordinary firmness from engaging in protected activity.

But even if the refusal to allow Russell to reschedule his furlough did rise to the level of an adverse action, Russell's claim would still fail to the extent that it is based upon the refusal. That is because Defendants have shown that they would have taken the action in the absence of Russell's protected speech. Chief of Department Dougherty determined that Russell would not be allowed to reschedule his furlough. Dougherty explained that he declined to reschedule Russell's furlough because the date on which Russell wanted to begin his furlough was the date that Lesa Kent from the Human Rights Department was scheduled to interview Russell as part of her investigation into Russell's charges against Flanagan. (*See* Dougherty Dep. at 27-28, ECF #28-2 at Pg. ID 599.) Simply put, Dougherty declined to permit

Russell to be absent on his requested day because his absence would have interfered with the orderly progress of Kent's investigation.  Russell has not presented any evidence to the contrary.  Thus, no reasonable jury could find that the Defendants denied Russell's requested furlough change because he engaged in protected speech, and Defendants are entitled to summary judgment on Russell's claim to the extent that it rests on the furlough change request refusal.

**3**

Russell next contends that the Defendants took adverse action against him by denying him overtime opportunities. (*See* Russell Dep. at 218-20, ECF #30-2 at Pg. ID 902-03.)  But he cites no evidence that any Defendant ever denied a single request for overtime that he presented.  Instead, Russell seems to argue that Defendants constructively denied him overtime opportunities by leaving intact the unacceptable risk that if he took overtime, he would be forced to work alongside Flanagan. However, Russell has not presented any evidence that he faced any risk of working with Flanagan once the two were detailed to separate stations.  As noted above, Flanagan went on medical leave and subsequently transferred out of Engine 17. (*See* Russell Dep. at 232-33, ECF #30-3 at Pg. ID 906.)  Russell has not presented any evidence showing that he faced any meaningful risk of encountering Flanagan on any overtime shift from that point forward.  Thus, he has not supported his theory that the Defendants constructively denied him overtime opportunities by leaving him

exposed to working with Flanagan, and the Defendants are entitled to summary judgment on his claim to the extent that it rests upon the lack of overtime opportunities allegation.

**4**

Russell also alleges that the Defendants took adverse action against him by deeming him absent without leave (AWOL). But Russell has not presented any evidence of a causal connection between the AWOL designation and his charges against Flanagan. Russell filed the charges against Flanagan in May 2013. He was deemed AWOL about 17 months later, in October 2014. That is not sufficient temporal proximity to support an inference of causation. *See Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) (finding temporal proximity insufficient to support inference of causal connection when alleged adverse action occurred eight months after protected speech). And Russell has not identified any other evidence that could support an inference that the AWOL designation resulted from his charges against Flanagan. Thus, to the extent that Russell's First Amendment retaliation claim rests upon the AWOL designation, it fails because Russell cannot establish the causation element of his prima face case.

**5**

Russell contends that the Defendants took adverse action against him by ignoring and/or failing to properly advance his charges against Flanagan through the

DFD discipline process. (*See* Resp. to Mot. for Summ. J., ECF #30 at Pg. ID 821-22.) But Russell has not cited any authority for the proposition that ignoring and/or failing to process a complaint rises to the level of an adverse action. And at least some courts have distinguished between ignoring protected speech in an employee's complaint and taking affirmative inappropriate action in response to such speech. *See, e.g., Jennings v. Town of Stratford*, 263 F.Supp.3d 391, 403 (D. Conn. 2017) (finding sufficient evidence of adverse action where "instead" of "do[ing] nothing" in response to an employee's complaint, a supervisor affirmatively threatened the employee with repercussions). Russell has not persuaded the Court that the Defendants' alleged failure to act in response to his charges against Flanagan rose to the level of an adverse action.

Moreover, Russell has not shown a causal connection between his protected speech and the Defendants' alleged failure to process his charges against Flanagan. As noted above, Flanagan's charges against Russell met the exact same fate as Russell's charges against Flanagan: both went nowhere in the DFD disciplinary process and neither of the charges was heard or resolved. The equal treatment of the two charges belies Russell's allegation that the Defendants declined to process Russell's charges against Flanagan because they contained protected speech. For all of these reasons, Defendants are entitled to summary judgment on Russell's

retaliation claim to the extent that it rests on the Defendants' alleged failure to advance his charges against Flanagan through the DFD grievance process.

**6**

Finally, Russell contends that Defendant Houseworth took adverse action against him when Houseworth threatened that Russell would face a "mind fuck" if Russell persisted in pursuing his charges against Flanagan. As the Sixth Circuit has explained, "threats alone can constitute an adverse action if the threat is capable of deterring a person of ordinary firmness from engaging in protected conduct." *Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010).[8] A jury could reasonably conclude that Houseworth's "mind fuck" comment was such a threat. Indeed, the statement can reasonably be interpreted as an admonition that unless Russell withdrew his charges against Flanagan, he would face serious emotional and psychological abuse without any avenue for relief. Russell may pursue his retaliation claim against Houseworth based upon this threat because Houseworth tied the threat to Russell's charges against Flanagan (which satisfies the causation element of Russell's claim) and because a jury could find that Houseworth would not have made the threat in the absence of Russell's charges against Flanagan.

---

[8] *See also Jennings*, 263 F.Supp.3d at 403 (supervisor's threat to employee amounted to adverse action sufficient to support First Amendment retaliation claim).

## V

The City of Detroit is entitled to summary judgment on Russell's Section 1983 claim. "A municipality is liable for a constitutional violation when execution of the municipality's policy or custom inflicts the alleged injury." *Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). However, "[a] municipality cannot be held liable under § 1983 absent an underlying constitutional violation by its officers." *Id.* As described above, with the sole exception of the First Amendment retaliation claim against Defendant Houseworth, Russell has not established any underlying constitutional violations by any of the individual Defendants. For that reason, the City of Detroit is entitled to summary judgment on all of Russell's claims other than the threat-based claim against Houseworth. And the City is entitled to summary judgment on that claim because Russell has not presented any evidence that the City had a custom or policy of tolerating threats by its officials against subordinate employees who engage in protected speech.

## VI

For the reasons stated above, Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. The motion is **DENIED** to the extent that it seeks summary judgment in favor of Defendant Houseworth on Russell's First Amendment retaliation

claim.  That claim may proceed to trial but only to the extent that it rests

upon Defendant Houseworth's alleged "mind fuck" threat.

2.  The motion is **GRANTED** in all other respects.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  May 2, 2018


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on May 2, 2018, by electronic means and/or ordinary mail.

s/ Holly A. Monda
Case Manager
(810) 341-9764